UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

CARLTON VOSE,                                          :
    Plaintiff                                     :
                                                      :
    v.                                            :     C.A. No.:
                                                      :
CITY OF PAWTUCKET,  a municipality                    :
of the State of Rhode Island; RICHARD J.              :     CA 18- 620
GOLDSTEIN, in his capacity as CITY CLERK              :
for the CITY OF PAWTUCKET;                            :
CHRISTOPHER DUPONT, individually and                  :
in his capacity as a police officer employed by       :
the CITY OF PAWTUCKET; CRAIG                          :
LETOURNEAU, individually and in his                   :
capacity as a police officer employed by the          :
CITY OF PAWTUCKET; JESS VENTURI,                      :
individually and in his capacity as a police          :
officer employed by the CITY OF                       :
PAWTUCKET; PETER GRAHAM, in his                       :
individual capacity; PAUL KING, individually          :
and in his capacity as police chief employed by       :
the CITY OF PAWTUCKET,                                :
    Defendants.                                   :

## COMPLAINT

### I.    Introductory Statement

This is an action brought by the Plaintiff, Carlton Vose, seeking compensatory and punitive

damages, as well as attorney's fees and litigation expenses and other equitable relief to remedy the

damage caused by the unlawful arrests and other offenses the Plaintiff has suffered in violation of

Plaintiff's constitutional rights protected under the Fourth, and Fourteenth Amendments to the

United States Constitution, actionable pursuant to 42 U.S.C. §1983, and under Article 1 of the

Rhode Island Constitution, actionable directly under state law in accordance with Jones v. State of

Rhode Island, 724 F.Supp. 25 (D.R.I. 1989), as well as various common law claims pursuant to Rhode Island State Tort Claims Act, R.I.G.L. §§9-31-1, et seq.

The Plaintiff was born and raised in the City of Pawtucket, then moved to Florida for college, after which he became a police officer, and then an attorney. He is currently licensed to practice law in the State of Massachusetts. The Plaintiff's mother began to develop dementia in approximately 2014. The Plaintiff was living in Florida at that time. He began to receive calls indicating that neighbors were concerned about strange questions that she was asking them, suggestive of dementia. The Plaintiff returned home from Florida to monitor the situation. Over the course of 2014 and 2015 the Pawtucket Police had numerous contacts with the Plaintiff's mother, and the Plaintiff became their contact whenever they needed to contact a family member. The Plaintiff's mother was otherwise very healthy, active, and vibrant, but for her developing memory issues, and she insisted on maintaining her independence. The Plaintiff, the Plaintiff's family, and the Plaintiff's family friends all tried to convince the Plaintiff's mother to accept offers of assistance, but she steadfastly refused. After two years of getting phone calls about the Plaintiff's mother walking around her neighborhood, the Pawtucket Police had grown tired of the Plaintiff's mother. The Pawtucket Police have admitted that they knew the Plaintiff's mother refused all offers of assistance, yet they went to a judge and told him exactly the opposite. The Pawtucket Police lied to a judge, in order to get a warrant to arrest the Plaintiff, by telling the judge that it was in fact the *Plaintiff* who refused assistance for his mother, when they knew it was in fact his *mother* who refused. The Pawtucket Police then went to the Plaintiff's home in Rhode Island, kicked down his front door, and arrested him for "Refusing to Allow the Division of Elderly Affairs to Develop a Plan of Care for an Elderly Person," and "Resisting Arrest." Both charges have been dismissed.

## II.    Parties

1.    Plaintiff is a resident of the State of Florida.

2.    Defendant City of Pawtucket ("City") is a duly authorized and organized municipality pursuant to the laws of the State of Rhode Island and is sued by and through its City Clerk, Richard Goldstein, the official designated by the City of Pawtucket to administer claims against the city.

3.    Defendant, Christopher Dupont ("Dupont"), during the time period relevant to this Complaint, was a police officer employed by Defendant City within its Police Department.

4.    Defendant, Craig Letourneau ("Letourneau"), during the time period relevant to this Complaint was a police officer employed by Defendant City within its Police Department.

5.    Defendant, Jess Venturini ("Venturini"), during the time period relevant to this Complaint was a police officer employed by Defendant City within its Police Department.

6.    Defendant, Peter Graham, during the time period relevant to this Complaint was an employee of the Rhode Island Division of Elderly Affairs, Protective Services Unit.

7.    Defendant, Paul King, during the time period relevant to this Complaint was employed by Defendant City as the police chief for its Police Department.

8.    Upon information and belief, Defendant, John Doe, during the time period relevant to this Complaint was an employee and/or agent of Defendant City.[1]

## III.    Jurisdiction and Venue

9.    This Court has jurisdiction over the Fourth and Fourteenth Amendment to the

---

[1] If and when the John Doe Defendant is identified, Plaintiff will submit a request to amend the Complaint.

Unites States Constitution claims under 42 U.S.C. 1983 pursuant to 28 U.S.C. §§1331 and 1343, and supplemental jurisdiction over Plaintiff's claims under Article 1of the Rhode Island Constitution and common law pursuant to 28 U.S.C. §1367.

10. Venue is proper in this district pursuant to 28 U.S.C. §1391(b)(2) because the events that give rise to the claims herein occurred in the District of Rhode Island.

## IV.   Material Facts

11. The Plaintiff was born and raised in the City of Pawtucket and lived at 314 Kenyon Ave from 1969 until 1989 when he moved to Florida to attend college.  After graduating from college, the Plaintiff became a police officer.  After retiring from the police department, the Plaintiff graduated from law school and became an attorney.  The Plaintiff is currently a licensed attorney in the State of Massachusetts.

12.  The Plaintiff's mother was born and raised in the City of Pawtucket and lived at 314 Kenyon Ave since her birth in 1945.  She worked at Memorial Hospital in Pawtucket for approximately 40 years.

13. The Plaintiff's mother's greatest fear in life was ending up in a nursing home. She stated countless times throughout her life that she would kill herself if she were abandoned in a nursing home, and she made her sons promise to never put her in a nursing home.  The Plaintiff's mother wanted nothing more than to spend her entire life in her home at 314 Kenyon Avenue.

14.  The Plaintiff's mother had never been deemed incompetent at any time relevant to this Complaint.

15.  The Plalintiff's mother had been seen by numerous doctors during 2014 and 2015 and not one of them suggested that her health was at risk by remaining at home.

16.  In 2014 the Plaintiff was living in Florida and returned to Rhode Island to

monitor his mother's behavior after receiving a phone call from her former employer indicating that she had been dropped off there by the police. The Plaintiff took up temporary residence at his childhood home at 314 Kenyon Avenue.

17. The Plaintiff has a full-time job and is required to work in order to provide self-support and pay his bills.

18. The Plaintiff's mother was fully self-sufficient and required no assistance with meals, bathing, getting dressed, mobility, or paying her bills.

19. The Plaintiff has not received any health-care training; he is not a medical professional of any type; and he is not, and has never been, a "primary caregiver" for his mother, as she has never needed such services.

20. The Plaintiff's mother was retired and would walk her dogs in the neighborhood several times a day. She would also walk to the convenience store, a local restaurant, a local pharmacy, and a local grocery store whenever she needed anything, as she had given up driving in 2012 due to poor vision. While walking in the neighborhood, she carried a trash bag with her and would pick up trash all along her route to keep her neighborhood clean.

21. The Plaintiff's mother loves animals more than anything else. She would adopt needy animals regularly. In approximately 2013 she adopted a dog from the Pawtucket Animal Shelter that was scheduled for euthanasia. The dog was crippled, blind, and toothless and required constant care, which the Plaintiff's mother was more than happy to provide if it meant saving the dog's life. The dog required hand-feeding and also suffered from incontinence. The Plaintiff's mother put down newspapers for the dog since it could not climb stairs due to a hobbled leg, and due to blindness.

22. While walking in the neighborhood, the Plaintiff's mother would ask strange

questions of the neighbors and make strange statements, which in turn would cause the neighbors to call the police out of concern for her mental condition.

23. The Plaintiff had numerous contacts with the Pawtucket Police as a result of the phone calls about his mother. The police asked if the Plaintiff could keep his mother on her property. The Plaintiff explained to the police that his mother insisted on maintaining her independence, and that she would not agree to remain on her property.

24. The police asked the Plaintiff to consider bringing his mother to adult day care at the local senior center called the Leon Mathieu Senior Center. The Plaintiff explained to the police that he was not his mother's guardian and that she remained free to do as she wished, and that she refused to go to the senior center, but that he and his brother would attempt to convince her to go.

25. The Plaintiff and his brother visited the Leon Mathieu Senior Center, as requested by the police, and the senior center personnel asked if the Plaintiff's mother would be cooperative. The Plaintiff explained to the senior center that his mother was very strongly opposed to being there, and would not even agree to get in the car to visit the center. The senior center personnel advised the Plaintiff that they did not accept clients who did not want to be there.

26. The Plaintiff and his brother advised the police that the senior center would not accept his mother as a client, and that the Plaintiff's mother would not agree to go to the senior center.

27. The Pawtucket Police asked the Plaintiff to talk to his mother about accepting a home care nurse to help supervise her during the day, with hopes that the nurse would keep her on the property.

28. The Plaintiff hired a home care nurse to come to the house, as requested by the

police, but the Plaintiff's mother verbally abused the nurse and told her to get out of the house. The nurse would not return after that incident and advised the Plaintiff that it is their policy that they cannot go to homes where their services are not welcomed.

29. The Plaintiff and his brother advised the police that the Plaintiff hired a home care nurse, but that the Plaintiff's mother threw her out of the house, and the nurse would not return.

30. The police asked the Plaintiff to discuss with his mother the possibility of moving into a nursing home with his mother.

31. The Plaintiff placed his mother in a nursing home in Warren, RI, as the police asked him to do, under the guise of being there for "memory testing." His mother soon realized why she was really there and was kicked out of the nursing home after threatening to jump the fence if she wasn't allowed to go home.

32. The Plaintiff then placed his mother in a "secure" nursing home in Greenville, RI, as the police asked him to do, again under the guise of going there for memory testing. His mother soon realized why she was really there and was kicked out of that nursing home after pulling the fire alarm, twice.

33. The Plaintiff then placed his mother in a geriatric-psychiatric ward at a Rhode Island hospital for evaluation, as the police asked him to do, this time for actual memory testing. After the evaluation took place, the hospital called the Plaintiff and asked him to come get his mother, as she did not require the level of care they provided and she wanted to go home.

34. After the Plaintiff brought his mother home, she again refused to stay on her property and returned to her daily routine in the neighborhood.

35. In the State of Rhode Island, the Division of Elderly Affairs is the agency

authorized to determine whether or not a person is in need of "services," pursuant to R.I.G.L. §§42-66-1, et seq.

36. The police brought the Plaintiff's mother to Butler Memorial Hospital for a psychiatric evaluation in approximately April of 2015. Plaintiff's mother was evaluated by Butler Hospital who concluded that the Plaintiff's mother was not in need of any services and was fine to return home.

37. A doctor at Butler Hospital stated that the Plaintiff's mother's routine of walking to familiar places in her neighborhood was helpful in keeping her calm and should not be discouraged.

38. While the Plaintiff's mother was at Butler Hospital, the Division of Elderly Affairs also evaluated the Plaintiff's mother and they concluded that she was not in need of any services and they also approved of her returning home.

39. While the Plaintiff's mother was being evaluated by the Division of Elderly Affairs at Butler Hospital, she also advised them that she refused to accept their services. Pursuant to R.I.G.L. § 42-66-8.2, "If the elderly person withdraws consent or refuses to accept protective services, the services shall not be provided."

40. While the Plaintiff's mother was being evaluated at Butler Hospital in April of 2015, an unknown person (Defendant John Doe) told Butler Hospital personnel that there was a warrant out for the Plaintiff's arrest.

41. There was no warrant out for Plaintiff's arrest in April of 2015.

42. Upon information and belief, Defendants Dupont and Graham, having failed to have the Plaintiff's mother committed to a mental institution, conspired to have the Plaintiff unlawfully arrested in violation of his civil rights.

43. Upon returning home, the Plaintiff's mother continued to walk in her neighborhood, and the police continued to unnecessarily pick her up, and drop her off in the parking lot of Memorial Hospital, without even walking her into the hospital.

44. On or about October 27, 2015 the Plaintiff filed a complaint with Defendant King, who was the Pawtucket Police Chief at that time, regarding his officers harassing his mother. The Plaintiff asked Defendant King to advise his officers to stay out of his mother's house and to stop unnecessarily taking her to the hospital, as there was nothing physically wrong with her.

45. At some point between October 27, 2015 and November 13, 2015, Defendant King contacted Defendant Graham and "begged" Defendant Graham to "do something about her [Plaintiff's mother]" because the police were "getting calls about her every day."

46. The police do not need permission from the Division of Elderly Affairs to make an arrest.

47. Upon information and belief, Defendants Dupont, Graham, and King conspired with each other to devise a plan to unlawfully arrest the Plaintiff, which would have the collateral effect of solving their "problem" with getting calls about the Plaintiff's mother every day.

48. On or about November 5, 2015 the Plaintiff scheduled a meeting with Defendant Graham to "discuss a plan of care" for his mother. The meeting was scheduled for November 10, 2015 at 11:00 a.m. The Plaintiff advised Defendant Graham that he would attempt to get some time out of work for the meeting.

49. On November 10, 2015, the Plaintiff was unable to get out of work commitments, so he called Defendant Graham to discuss the plan of care over the phone. Defendant Graham stated that a conversation over the phone "was not what he had planned for,"

and refused to have the discussion about the plan of care over the phone. Defendant Graham stated that he would call the Plaintiff back, but he never did.

50. On March 19, 2015, Defendant Dupont sent out an email to a group of police officers that patrolled the Plaintiff's neighborhood, in which Defendant Dupont admitted that he knew that it was the Plaintiff's _mother_, not the Plaintiff, who refused the "services" Dupont alleges that she needed.

51. On or about November 13, 2015, Defendant Dupont appeared before a judge in Providence County, Rhode Island, and swore under oath, subject to the penalties of perjury, that the _Plaintiff_ refused the services, after having already admitted that it was his _mother_ who refused the services.

52. On or about November 13, 2015, Defendant Dupont appeared before a judge with the intent to obtain an arrest warrant for the Plaintiff (after the Police Chief had just begged the Division of Elderly Affairs to do something about this matter, and just two weeks after the Plaintiff filed a complaint against the Pawtucket Police), and told the judge that the Plaintiff (who is a retired police officer, and a licensed attorney) had conveniently confessed to him (on some unknown date, during an unknown conversation), all of the elements of the crime for which he was seeking the warrant.

53. On November 13, 2015, Defendant Dupont appeared before a judge in Providence County, Rhode Island, and swore under oath, subject to the penalties of perjury, that the Plaintiff drove his mother's vehicle. The Plaintiff's mother did not own a vehicle.

54. On November 13, 2015 Defendant Dupont appeared before a judge and told that judge that the Plaintiff's mother was in need of "services." Defendant Dupont was aware that a doctor and the Division of Elderly Affairs had already concluded that she was not in need of any

services.  Defendant Dupont knowingly and intentionally made false statements to the judge for the purpose of unlawfully achieving an unlawful objective.

55. On November 13, 2015, Defendant Dupont appeared before a judge in Providence County, Rhode Island, and swore under oath, subject to the penalties of perjury that he had spoken to the Plaintiff twice about his mother and that the Plaintiff admitted to being her "primary caregiver," that his mother was in need of services, and that he refused to provide those services.  Defendant Dupont knew that the Plaintiff had never made such admissions.

56. The Plaintiff has never spoken to Defendant Dupont about his mother.

57. The Plaintiff has never been a "primary caregiver" for his mother.

58. The Plaintiff never admitted that his mother was in need of "services," because she was not in need of "services."

59. The Plaintiff never refused to provide any "services."

60. On November 13, 2015, Defendants Dupont, Letourneau, and Venturini came to the Plaintiff's home at 314 Kenyon Avenue to execute the arrest warrant.  The Plaintiff was unlawfully arrested and was processed and criminally charged with "Refusing to Allow the Division of Elderly Affairs to Develop a Plan of Care for an Elderly Person" in violation of R.I.G.L. §11-5-12.  The charge was dismissed.

61. At the time of arrest, the Plaintiff offered no resistance, yet he was unlawfully arrested and was processed and criminally charged with "Resisting Arrest" in violation of R.I.G.L. §12-7-10.  The charge was dismissed.

62. The Plaintiff was unlawfully detained in a jail cell at the Pawtucket Police station, overnight from November 13, 2015 to November 14, 2015.

63. When the Plaintiff was arrested, there was a full container of quarters (U.S.

currency, 25 cent coins) on a table in his kitchen. When the Plaintiff returned home the next day, half of the quarters were gone.

64. When the Plaintiff was arrested, there were two vintage U.S. Treasury Notes on the refrigerator door secured with magnets. When the Plaintiff returned home the next day, the Treasury Notes were gone.

65. Nobody else entered the Plaintiff's apartment on November 13, 2015 other than Defendants Dupont, Letourneau, and Venturini.

66. The Plaintiff's mother suffered no harm while living at home.

67. Over the past three years, the Plaintiff's mother has been drugged into compliance; placed in a diaper; allowed to sit in a urine-soaked diaper; neglected to the point of developing a life-threatening sepsis infection; neglected to the point where her teeth are the size of tic-tacs, and brown; stripped of her glasses so that she cannot see; her pets, which she loved more than anything in this world, have been taken from her, never to be seen again; and she has been isolated from her family for three years, all since being placed in the custody of the State of Rhode Island, under the premise of "helping" her, because the police were tired of getting calls about her.

68. The Plaintiff, and his brother, have not been allowed to visit or speak to their own mother for the last three years, despite having been convicted of nothing.


## V.    Claims for Relief

69. The Plaintiff incorporates in the Counts below the allegations contained in paragraphs 1 through 68 above.

## Count One
### 42 U.S.C. §1983 (Unlawful Arrest – Elderly Neglect)

70. At all times relevant to this action, 42 U.S.C. §1983 was in full force and effect and applied to Defendants' conduct.

71. 42 U.S.C. §1983 provides: "Every person who, under color of any statute, ordinance, regulation, custom or usage of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress... ."

72. The Plaintiff is a citizen of the United States and the identified Defendants to this claim are persons for purposes of 42 U.S.C. §1983.

73. The Defendants acted under color of statute, ordinance, regulation, policy, custom, and/or usage of law.

74. The Defendants subjected the Plaintiff to unreasonable seizure and deprived the Plaintiff of his liberty and property without due process of law under the Fourth and Fourteenth Amendments to the United States Constitution, in violation of 42 U.S.C. §1983.

75. Defendant City acted with deliberate indifference in violating the constitutional and statutory rights of the Plaintiff in violation of 42 U.S.C. §1983.

76. The Plaintiff is therefore entitled to damages as described below.

## Count Two
### 42 U.S.C. §1983 (Unlawful Arrest – Resisting Arrest)

77. At all times relevant to this action, 42 U.S.C. §1983 was in full force and effect and applied to Defendants' conduct.

78. 42 U.S.C. §1983 provides: "Every person who, under color of any statute, ordinance, regulation, custom or usage of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress... ."

79. The Plaintiff is a citizen of the United States and the identified Defendants to this claim are persons for purposes of 42 U.S.C. §1983.

80. The Defendants acted under color of statute, ordinance, regulation, policy, custom, and/or usage of law.

81. The Defendants subjected the Plaintiff to unreasonable seizure and deprived the Plaintiff of his liberty and property without due process of law under the Fourth and Fourteenth Amendments to the United States Constitution, in violation of 42 U.S.C. §1983.

82. Defendant City acted with deliberate indifference in violating the constitutional and statutory rights of the Plaintiff in violation of 42 U.S.C. §1983.

The Plaintiff is therefore entitled to damages as described below.

## Count Three
## Article I, §6 of the Rhode Island Constitution

83. At all times relevant to this action, Article I, §6 of the R.I. Constitution was in full force and effect and applied to Defendants' conduct.

84. Article I, §6 provides: The right of the people to be secure in their persons, papers and possessions, against unreasonable searches and seizures, shall not be violated; and no warrant shall

issue, but on complaint in writing, upon probable cause, supported by oath or affirmation, and describing as nearly as may be, the place to be searched and the persons or things to be seized.

85. The Defendants, by their individual and concerted acts and/or omissions, including, but not limited to, those described herein, subjected the Plaintiff to unreasonable seizure in violation of Article I, §6 of the R.I. Constitution.

86. The Plaintiff is therefore entitled to damages as described below.

## Count Four
## Malicious Prosecution

87. Defendants, by their individual and concerted acts and/or omissions including, but not limited to, those described herein, maliciously instituted a criminal action against the Plaintiff without probable cause that terminated in the Plaintiff's favor, causing the Plaintiff to sustain damages as aforesaid.

88. The Plaintiff is therefore entitled to damages as described below.

## Count Five
## False Arrest

89. Defendants, by their individual and concerted acts and/or omissions, including, but not limited to, those described herein, did unlawfully and without cause detain and falsely arrest the Plaintiff in violation of state law, causing the Plaintiff to suffer damages as aforesaid.

90. The Plaintiff is therefore entitled to damages as described below.

## Count Six
## Civil Conspiracy

91. Defendants Dupont, Graham, and King came to an agreement to achieve an unlawful objective, and to achieve that unlawful objective through unlawful means. Defendants Dupont, Graham, and King committed one or more overt acts in furtherance of the agreed upon objective and their overt acts resulted in an injury or damages to the plaintiff.

92. The Plaintiff is therefore entitled to damages as described below.

## Count Seven
## Conversion of Property

93. Defendants Dupont, Letourneau, and Venturini did intentionally exercise dominion or control over the Plaintiff's property such that the Plaintiff has been deprived of the property by the unauthorized act and/or conduct of Defendants Dupont, Letourneau, and Venturini.

94. The Plaintiff is therefore entitled to damages as described below.

## Count Eight
## Civil Perjury

95. Defendant Dupont, while under oath or affirmation to speak the truth, knowingly and intentionally made false and material declarations and made use of other information, knowing them to be false material declarations and information, with the intent to maliciously harm the Plaintiff and unlawfully deprive him of his liberty.

96. The Plaintiff is therefore entitled to damages as described below.

## Count Nine
## Damage to Property

97. Defendants Dupont, Letourneau, and Venturini did unlawfully damage the Plaintiff's property while in the course of effecting the unlawful arrests described hereinabove.

98. The Plaintiff is therefore entitled to damages as described below.

## Count Ten
## False Imprisonment

98. Defendant City, Dupont, Letourneau, and Venturini did unlawfully confine the Plaintiff in jail at the Pawtucket police station from November 13, 2015 until November 14, 2015; said confinement was not legally justified; and Defendants knew said confinement was not legally justified.

99. The Plaintiff is therefore entitled to damages as described below.

## VI.    <u>Prayers for Relief</u>

WHEREFORE, the Plaintiff respectfully prays that this Court grant the following relief against the Defendants:

a.      an award of compensatory damages;

b.      an award of punitive damages;

c.      an award of reasonable attorney's fees, costs of litigation to Plaintiff's attorneys, and statutory interest; and,

d.      such other and further relief as the Court deems just and proper.

## VII.    Demand for Jury Trial

The Plaintiff hereby demands a trial by jury on all counts so triable.

Plaintiff, Pro Se

Carlton Vose, Pro Se
Mass BBO #680548
314 Kenyon Ave
Pawtucket, RI 02861
carltonvose@gmail.com
904-755-4641